**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Megan Castillo, et al., | No. CV-24-02279-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Yuma County Board of Supervisors, et al., | |
| Defendants. | |

The Court now considers: Defendant Jonquil Michael's Motion to Dismiss (Doc. 218); Defendant Yuma County Board of Supervisors' (the "Board") Motion to Dismiss (Doc. 219); Defendant Community Bridge, Inc's ("CBI") Motion to Dismiss (Doc. 220); Defendant Africa Carrasco's Motion to Dismiss (Doc. 221); Defendant John Hogeboom's Motion to Dismiss (Doc. 222); Defendant Jennifer Andjelich's Motion to Dismiss (Doc. 224); and Defendant Jon Caldwell's Motion to Dismiss (Doc. 227) (collectively, the "Motions"). The Court heard oral argument on the Motions on February 19, 2026. The Court rules as follows.

I.      BACKGROUND

On October 9, 2025, the Court issued an Order partially dismissing the First Amended Complaint ("FAC") with leave to amend (the "October Order"). (Doc. 209 at 16.) The October Order dismissed Plaintiffs' 42 U.S.C. § 1983 claims against Andjelich and Michael because the FAC did not adequately allege that Andjelich and Michael were state actors. (*Id.*). This stirred up the proverbial hornet's nest; Plaintiffs have since filed a

Second Amended Complaint ("SAC"), which each Defendant separately moves to dismiss. This flurry of activity is understandable. Although the October Order was limited to dismissing the § 1983 claims against Andjelich and Michael, its findings suggested that the FAC's remaining § 1983 claims were similarly flawed. The Court now considers the SAC.

In short, this case arises from Plaintiff Megan Castillo's ("Castillo") civil commitment at CBI. (Doc. 209 at 1.) Castillo's daughter applied to have her committed, resulting in Castillo being evaluated at CBI for multiple days. (*Id.* at 2.) In response, Castillo and her husband, Scott Castillo ("Scott"), asserted a variety of state and federal law claims against Defendants. The Court begins by outlining Arizona's civil commitment process. It then summarizes CBI's contract with Yuma County (the "County") to provide commitment services for the County. Finally, the Court relays the facts surrounding Castillo's commitment.

**A. Arizona's Civil Commitment Process**

The Court begins by briefly outlining a cursory overview of Arizona's civil commitment process. Commitments are conducted by "evaluation agencies" and begin with either an application for evaluation ("AFA") or an emergency application for evaluation ("AEA"). *See* A.R.S. §§ 36-520 *et seq.* AFAs and AEAs are different mechanisms that lead to an evaluation agency filing a petition for a court ordered evaluation ("PCOE"). A.R.S. § 36-530(B). If the PCOE is granted, the evaluation agency can evaluate the patient for up to 72 hours. *Id.* After an evaluation, the agency can release the patient or file a petition for court ordered treatment. A.R.S § 36-531. Here, Castillo was released after evaluation. (Doc. 213 at 29 ¶ 101.) The Court briefly explains the differences between an AFA and an AEA.

The Court first outlines the AFA process, or the "non-emergency process" for applying a court ordered evaluation. "Any responsible individual may apply for a court-ordered evaluation of a person" whom the applicant believes to be a danger to themselves or others. § 36-520(A). Within forty-eight hours of receiving a valid AFA, the evaluation agency must conduct a pre-PCOE screening. § 36-520(E)–(G). This screening

can be conducted at either: (1) the evaluation agency if the applicant presents the person to be evaluated; or (2) at the person's home (or wherever the person is found) if the person is not presented to the agency. *Id.* The evaluation agency can then submit a PCOE if "there is reasonable cause to believe the person has a persistent or acute disability or a grave disability or is a danger to self or others as a result of a mental disorder, and . . . will [not] voluntarily receive evaluation." A.R.S § 36-521(B).

The AEA process, or "emergency process," for receiving a court ordered evaluation proceeds as follows. An AEA can be submitted "by a person with knowledge of the facts requiring emergency admission," which are the same facts that justify an AFA. *See* A.R.S. § 36-524(C)(1). However, an AEA is appropriate when "during the time necessary to complete the [AFA] prepetition screening procedures . . . the person is likely without immediate hospitalization to suffer serious physical harm or serious illness or is likely to inflict serious physical harm on another person." *Id.* Once an AEA is submitted, the evaluation agency's "admitting officer" determines whether there is "reasonable cause to believe that an emergency examination is necessary." § 36-524(E). If such cause exists, the admitting officer may order law enforcement to transport the person to the evaluation agency. *Id.* Once the person arrives at the agency, the following takes place:

> [The] admitting officer . . . shall perform an examination of the person's psychiatric and physical condition and may admit the person to the agency as an emergency patient if . . . there is reasonable cause to believe that the person, as a result of a mental disorder, is a danger to self or others, has a persistent or acute disability or a grave disability and is unable or unwilling to undergo voluntary evaluation and that during the time necessary to complete the prepetition screening procedures . . . [and] the person is likely without immediate hospitalization to suffer serious physical harm or serious illness or to inflict serious physical harm on another person.

§ 36-526(A). Then, the evaluation agency's medical director can file a PCOE. § 36-526(B). "A person taken into custody for emergency admission may not be detained longer than twenty-four hours . . . unless a petition for court-ordered evaluation is filed." A.R.S. § 36-527(A).

Castillo alleges that CBI did not abide by the foregoing processes. Thus, Castillo

- 3 -

and Scott sue the following:

- **The Board**: A political subdivision of Arizona.  (Doc. 213 at 1 ¶ 2.)
- **CBI**: The evaluation agency retained by the Board to service Yuma County (the "County").  (*Id.* at 2 ¶ 3, 6 ¶ 18.)
- **Hogeboom**: CBI's President and CEO.  (*Id.* at 3 ¶ 6.)
- **Caldwell**: An independent contractor designated as CBI's Medical Director.   (*Id.* ¶ 7); *see* A.R.S. § 36-501(24) (defining "medical director").  In that role, he "was authorized to execute [PCOEs] of persons involuntarily brought to [CBI]."  (Doc. 213 at 3 ¶ 6.)
- **Michael**: An independent contractor designated as an Admitting Officer at CBI.  (*Id.* at 4 ¶ 8); § 36-501(2) (defining "admitting officer).  In that role, she "was authorized to order individuals subject to an [AEA]" "to be apprehended and transported to [CBI]."  (*Id.*)  She "was also authorized to order individuals brought to the facility pursuant to an order issued under an AEA to be detained in the [CBI's] '23 Hour Crisis Protocol' and then transferred involuntarily to in-patient detention."  (*Id.*)
- **Carrasco**: An Admission Coordinator and Court Liaison at CBI.  (*Id.* at 8 ¶ 9.)
- **Andjelich**: An independent contractor who performed "behavioral health examinations/evaluations of persons brought to, and detained involuntarily at, the [CBI] under an AEA."  (*Id.* at 5 ¶ 10.)

This Order refers to CBI, Hogeboom, Caldwell, Michael, Carrasco, and Andjelich collectively as the "CBI Defendants."

### B.  The Agreement

Before detailing Castillo's commitment, the Court surveys the agreement between the Board and CBI.  The Court clarifies a point of confusion generated by the SAC.  Originally, Plaintiffs alleged that CBI contracted with the Board in May 2023.  (Doc. 50 at 6 ¶ 13.)  Now, Plaintiffs allege that CBI contracted with the Board in June 2024.  (Doc. 213 at 6 ¶ 15.)  This change is significant because Castillo was committed on February 26, 2024.  (*Id.* at 20 ¶ 66.)  Thus—and as Plaintiffs' counsel conceded at oral argument—the June 2024 contract has no legal relevancy to this litigation.  Accordingly, the Court will not consider the June 2024 contract in resolving the present Motions.

Fortunately for Plaintiffs, their mistake is not fatal.  During oral argument, the parties clarified that CBI was still acting under contract with the County at the time of Castillo's commitment.  Prior to the June 2024 contract, Horizon Health and Wellness, Inc.

("Horizon Health") was under contract with the County to provide evaluation services. (Doc. 213-1 at 2–7.) However, in 2023, Horizon Health assigned its responsibilities under that contract to CBI. (Doc. 213 at 12 ¶ 38.) Accordingly, the operative contract in this case is the one between the County and Horizon Health as assigned to CBI (the "Agreement"). However, the SAC only attaches a copy of a contract between Horizon Health and the Board which "terminate[d] on June 30, 2018." (Doc. 213-1 at 2.) Accordingly, the SAC attaches copies of two inoperative contracts. Defendants do not appear to take umbrage with this mistake. Given the lack of challenge to this mistake, and the fact that it does not materially impact the Court's analysis, the Court assumes that the SAC accurately quotes the Agreement when it is actually quoting the June 2024 contract. With this clarification in the mind, the Court returns to the substance of the Agreement.

The SAC alleges as follows. Under the Agreement, CBI and the Board agreed to "act jointly and cooperatively in developing and implementing a unified, cohesive and well-integrated system of mental health services in Yuma County." (Doc. 213 at 6 ¶ 17.) CBI agreed that it would provide "screening and evaluation services for, and on behalf of the County pursuant to, in accordance with" Arizona law. (*Id.* at 13 ¶ 39.) In return, CBI would be paid $1.3 million annually. (*Id.* ¶ 41.)

The SAC goes on to note that under the Agreement, CBI would represent the County at public meetings concerning the delivery of screening and evaluation services. (*Id.* at 14 ¶ 42.) CBI was also required to provide the Board with "monthly utilization reports, and was subjected to audits by representatives of the Board." (*Id.* at 15 ¶ 42.) The Agreement also delegated multiple functions to the County Attorney. (*Id.* at 14 ¶ 42.) Primarily, the County Attorney was responsible for coordinating with the CBI to develop and implement the "policies and practices for":

> (1) the coordination of, justification for, and Petitioning of, persons subject to Court Ordered Evaluations, (2) the designation of agents of the County Attorney to collaborate with CBI in its screening and evaluation services, (3) the appointment of and training of "Court Liaisons" agents of CBI to develop facts and prepare Petitions for Court Ordered Evaluations for execution by the Medical Director and carry through the process from filing to final adjudication.

- 5 -

(*Id.*)  Additionally, the Agreement "[d]elegated to the County Attorney responsibility to develop and educate CBI agents on the Yuma County procedures and requirements for filing and prosecution of Petitions for Court Ordered Evaluations and Court Ordered Treatment."  (*Id.* at 15 ¶ 42.)  The Court turns next to Castillo's commitment in particular.

### C.  Castillo's Commitment

The SAC details Castillo's commitment as follows.  On February 26, 2024, Castillo had an "altercation" with her daughter, Shelby.  (*Id.* at 20 ¶ 66.)  Shelby went to CBI, met with Carrasco, and with Carrasco's assistance obtained and filled out an AFE (the "Application").  (*Id.*)  Two days later, the Application was notarized, reviewed by Carrasco, and transmitted to Michael who then authorized Carrasco "to prepare, sign and issue to the Yuma Police Department the Order for Apprehension and Transport naming Megan Castillo" (the "Order").  (*Id.* at 21 ¶ 68.)  The Application was improperly identified as an AEA but was identified as such pursuant to CBI policy.  (*Id.* ¶ 67.)  Carrasco sent the Order and the Application to the Yuma Police Department.  (*Id.* ¶ 70.)  Then, two police officers took Castillo into custody, transported her to CBI, and transferred her to Carrasco's custody.  (*Id.* at 22 ¶ 73.)  Castillo was then "subjected to several involuntary assessments."  (*Id.* at 28 ¶ 100.)  Afterwards, Carrasco prepared a PCOE (the "Petition") by "cut[ting] and past[ing] from the [Application]."  (*Id.* at 29 ¶ 101.)  Caldwell signed the Petition and Carrasco filed it with state court.  (*Id.* ¶¶ 103–04.)  The state court approved the Petition, allowing Castillo to be detained up to an additional 72 hours.  (*Id.* ¶ 106.)  Castillo underwent further evaluations and was released on March 2nd.  (*Id.* at 31 ¶ 114.)

Plaintiffs assert that the CBI Defendants committed Castillo without following proper protocol.  The SAC alleges that the CBI Defendants' "violations included, but are not limited to:"

    a.  Failing to initiate the statutorily-required Prepetition Screening process upon receipt of the AFE;

    b.  Issuing and executing the Order without an AEA;

    c.  Issuing and executing the Order without first requiring Shelby to submit the required AEA with the statutorily required allegations and evidence;

    d.  Issuing the Order without having conducted any investigation and assessment required by law;

e. Upon presentation of Mrs. Castillo at the facility, detaining her without conducting the required psychiatric and physical examinations, thus having no probable cause that Mrs. Castillo suffered from a mental disorder, making her a danger to self or others with the likelihood of suffering serious injury, or causing serious injury to another in the time necessary to conduct a Prepetition Screening;

f. Assigning Mrs. Castillo a diagnosis of a mental disorder as policy; and

g. Commencing involuntarily detention, with the knowledge that Mr. Castillo would be subjected to nursing assessments, laboratory testing, drawing and processing of blood samples, prescription of psychotropic medications, involuntary transfer to in-patient status, and Petition for Court Ordered Evaluation.

(Doc. 213 at 23–24 ¶ 77.)

Based on the foregoing, Plaintiffs assert the following claims:

- **Count I**: Castillo claims that CBI, Hogeboom, Michael, and Carrasco violated her Fourth, Fifth, and Fourteenth Amendment rights based on her commitment. (*Id.* at 20.)
- **Count II**: Plaintiffs claim that CBI, Hogeboom, Michael, and Carrasco violated their right to familial association under the First and Fourteenth Amendment by subjecting Castillo to civil commitment. (*Id.* at 24.)
- **Count III**: Castillo claims that CBI and Andjelich violated her Fourth and Fourteenth Amendment rights based on her commitment. (*Id.* at 25.)
- **Count IV**: Castillo claims that the Board violated her Fourth and Fourteenth Amendment rights based on her commitment. (*Id.* at 27.)
- **Count V**: Plaintiffs claim that the Board violated their right to familial association under the First and Fourteenth Amendments based on Castillo's commitment. (*Id.* at 28.)
- **Count VI**: Castillo claims that CBI, Carrasco, and Caldwell violated her Fifth and Fourteenth Amendment rights by engaging in judicial deception. (*Id.*)
- **Count VII**: Plaintiffs claim that all Defendants conspired against them in violation of § 1983. (*Id.* at 31.)
- **Count VIII**: Castillo claims that CBI, Hogeboom, Carrasco, Michael, Andjelich, and Caldwell defamed her. (*Id.* at 32.)
- **Count IX**: Castillo claims that CBI, Hogeboom, and Andjelich committed battery against her. (*Id.* at 33.)

Each Defendant moves to dismiss each claim asserted against them. The Court now considers the Motions.

## II.    LEGAL STANDARD

To survive a motion for failure to state a claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must meet the requirements of Rule 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This notice exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility . . . .'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a Rule 12(b)(6) motion to dismiss, the well-pleaded factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings when ruling on a Rule 12(b)(6) motion to dismiss. *See United States*

*v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003).  "A court may, however, consider materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

## III.    DISCUSSION

The SAC asserts two categories of claims: (1) the § 1983 claims (Counts I through VII); and (2) the state law claims (Counts VIII and IX).  The Court addresses each category in turn.

### A.  § 1983: General Principles

The Court begins with the § 1983 claims.  Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights fairly attributable to the government?"  *Pasadena Republican Club v. W. Just. Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021) (citation modified).  To state a § 1983 claim, "a plaintiff must 'plead that (1) the defendants acted under color of state law and (2) deprived plaintiff of rights secured by the Constitution or federal statutes.'"  *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 372 (9th Cir. 1999) (en banc) (quoting *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).

Generally, § 1983 claims are brought against individuals.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).  However, § 1983 liability can extend to municipalities, local government entities, and private entities under a *Monell* claim.  *See id.* at 1139.  In *Monell v. Department of Social Services*, 436 U.S. 658, 692 (1978), the Supreme Court made clear that § 1983 does not "impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a

tortfeasor." However, an entity can be liable for an individual's constitutional violation where that violation is caused by "a policy, practice, or custom of the entity, or be the result of an order by a policy-making officer." *Tsao*, 698 F.3d at 1139 (citation modified).

To assert a *Monell* claim, a plaintiff must prove: "(1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40*, 130 F.3d 432, 438 (9th Cir. 1997) (citation modified). Ultimately, "there must be 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). Where a *Monell* claim is brought against a private entity, a plaintiff must first demonstrate that the entity is a state actor. *See Tsao*, 698 F.3d at 1139.

Here, Plaintiffs assert § 1983 claims against private individuals, a private entity (CBI), and a municipal entity (the Board). The CBI Defendants' Motions seek dismissal of the § 1983 claims on the basis that they are not state actors. Of course, the Board cannot avail itself of this argument because it is a state actor, so its Motion seeks dismissal on alternative grounds. The Court first considers whether the CBI Defendants are state actors. It then considers Plaintiffs' *Monell* claims.

### B.  § 1983: State Action Requirement

"The determination of whether a nominally private person or corporation acts under color of state law 'is a matter of normative judgment, and the criteria lack rigid simplicity.'" *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)). Importantly, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood*, 531 U.S. at 295–96. Nevertheless, for a private party to be a state actor, they "must meet (1) the

state policy requirement, and (2) the state actor requirement." *Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1121 (9th Cir. 2022). The parties do not dispute the state policy requirement is satisfied in this case, which was addressed in the October Order. (Doc. 209 at 6.) Thus, the Court considers the state actor requirement.

"[T]he Supreme Court has identified four tests for when a private party 'may fairly be said to be a state actor'": (1) the public function test, (2) the joint action test, (3) the state compulsion test, and (4) the nexus test." *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 755 (9th Cir. 2024) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).[1] The public function tests asks whether private parties have been "endowed by the State with powers or functions" that are "both traditionally and exclusively governmental." *Lee v. Katz*, 276 F.3d 550, 554–55 (9th Cir. 2002) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). The joint action test asks whether a private party has participated or conspired with the state such that their actions are substantially and inextricably intertwined with those of the government. *See Solomon v. L.V. Metro. Police Dep't*, 441 F. Supp. 3d 1090, 1098 (D. Nev. 2020). The state compulsion test asks "whether the coercive influence or 'significant encouragement' of the state effectively converts a private action into a government action." *Kirtley v. Rainey*, 326 F.3d 1088, 1094 (9th Cir. 2003). Finally, the nexus test asks whether "there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood*, 531 U.S. at 295 (citation modified).

"Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Kirtley*, 326 F.3d at 1092. Regardless of which test is used, "the inquiry is always whether the defendant has exercised power possessed by virtue of

---

[1] Plaintiffs assert that the *Rawson* court "set out the mandatory precedent that a district court [must] employ these tests as complementary factors in determining" whether a private party is a state actor. (Doc. 230 at 6–7.) However, the *Rawson* court expressly recognized that these are "four different general tests" and that "[s]atisfaction of any one test is sufficient to find state action." 975 F.3d at 747 (citation modified). Other Ninth Circuit cases published after *Rawson* have not employed the "complementary factor approach." *See, e.g., Ochoa v. Pub. Consulting Grp., Inc.*, 48 F.4th 1102, 1109 (9th Cir. 2022) ("Here, the private defendants can be considered state actors under the nexus test."). Thus, *Rawson*, while helpful, does not set out a mandatory complementary factor test.

state law and made possible only because the wrongdoer is clothed with the authority of state law." *Rawson*, 975 F.3d at 748 (quotation marks omitted) (quoting *West v, Atkins*, 487 U.S. 42, 49 (1988)).

Critically, application of these tests "begins by identifying the specific conduct of which the plaintiff complains." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999) (citation modified).   Here, the issue is whether a private healthcare organization's commitment of an individual against their will "may be fairly attributable to the State." *See id.*  As a general principle, "private doctors and hospitals are not considered to be state actors."  *Morrison v. Billings Clinic*, 703 F. Supp. 3d 1245, 1251 (D. Mont. 2023); *see Briley v. California*, 564 F.2d 849, 855–56 (9th Cir. 1977) ("Similarly, in this and other circuits, private hospitals and physicians have consistently been dismissed from § 1983 actions for failing to come within the color of state law requirement of this section."). "However, it is the physician's function within the state system, not his private-contractor status, that determines whether his conduct could fairly be attributed to the State." *Scianna v. Arizona*, No. CV-21-01444-PHX-DJH, 2025 WL 963600, at *9 (D. Ariz. Mar. 31, 2025) (citation modified).  Notably, "a majority of courts hold that involuntary commitment by private physicians pursuant to a state statute does not result in state action."  *Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995) (commenting on the First, Seventh, and Eleventh Circuits' precedents).

1. *The Public Function Test*

The Court begins with the public function test.  Again, the public function test asks whether private parties are performing a function traditionally performed exclusively by the State.  *See Lee*, 276 F.3d at 554–55.  Plaintiffs, relying on *Rawson*, urge the Court to apply a modified version of the public function test as one factor among many in evaluating state action.  (Doc. 230 at 9–10.)  This application of the test is inappropriate because the public function test, by itself, "is sufficient to find state action, so long as no countervailing factor exists."  *Rawson*, 975 F.3d at 747 (citation modified).

The Supreme Court has made clear that under the public function test, "the relevant

question is not simply whether a private group is serving *a* 'public function.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (emphasis added). Instead, "the question is whether the function performed has been traditionally the exclusive prerogative of the State." *Id.* (citation modified). Indeed, *Rawson* acknowledged as much, noting that "[t]he public function test is satisfied only on a showing that the function at issue is both traditionally and exclusively governmental." *Id.* at 748 (citation modified). Thus, *Rawson* did not modify the public function test. With this clarification in mind, the Court finds that the public function test is not satisfied here.

To start, *Rawson* did not find that civil commitments are a traditional and exclusive government function. Instead, *Rawson* suggests that states have an interest in civil commitments based on their police and *parens patriae* powers. Indeed, *Rawson* recognized that "*very few*" functions have been "exclusively reserved to the State." *Id.* at 751 n.8 (emphasis added) (quoting *Flagg Bros. v. Brooks*, 436 U.S. 149, 158 (1978)). Prior to *Rawson*, the Ninth Circuit sympathized with other courts which found "that mental health commitments do not constitute a function exclusively reserved to the State" and that "a person wrongly committed for evaluation is not necessarily the victim of state action." *Jensen v. Lane County*, 222 F.3d 570, 574 (9th Cir. 2000) (citation modified). *Rawson* acknowledged this finding and left it undisturbed. *See* 975 F.3d at 751 n.8. The Court sees no reason to do otherwise.

Plaintiffs disagree, contending that "the dispositive question is whether the *power to seize and continue detention of a citizen against her will* traditionally was, under Arizona law, an exclusively governmental function. (Doc. 230 at 10.) However, courts analyze whether civil commitment is a public function more narrowly than Plaintiffs propose. The question is not "whether the power to seize and continue detention" is a public function. Instead, the question is whether civil commitment is a public function. *See, e.g.*, *Jensen v. Lane County*, 222 F.3d 570, 574 (9th Cir. 2000). Plaintiffs fail to cite any authority establishing that civil commitments are either a public function generally, or in Arizona.

Aside from those cases already mentioned, courts routinely conclude that civil

commitments are not a public function.  For example, the Court in *Sturm v. El Camino Hospital*, No. C-09-02324 RMW, 2010 WL 725563, at *3 (N.D. Cal. Feb. 26, 2010), noted that "[b]y detaining plaintiff for mental health treatment and evaluation, the private parties involved did not exercise power that is traditionally the exclusive prerogative of the State." (citation modified).  Finally, and as noted in the October Order, the court in *Douglass v. HonorHealth*, No. CV-24-00928-PHX-MTL, 2024 WL 4475093, at *3 (D. Ariz. Oct. 11, 2024) found that "countless courts have previously assessed the involuntary commitment of a patient by a private hospital and have consistently determined that the public function test is inapt." *See Bass v. Parkwood Hosp.*, 180 F.3d 234, 243 (5th Cir. 1999) (Noting that "private commitment of the mentally ill was common practice in eighteenth century England . . . [t]hus, the commitment and treatment of the mentally ill could not be deemed a function traditionally within the exclusive province of the state").

Neither do Plaintiffs cite any authority establishing that civil commitment is a public function in Arizona.  Plaintiffs, in their response to CBI's Motion, attach a declaration of an Arizona attorney who posits that "Arizona's system of involuntary treatment for mental illness began as a government-run process, and has continued so to the present day." (Doc. 230-2 at 3.)  This declaration does not persuasively suggest that civil commitment is among the "very few" functions traditionally and exclusively reserved to Arizona.  *See Flagg Bros.*, 436 U.S. at 158.  At most, the declaration establishes that Arizona has historically regulated civil commitments.  However, Arizona has historically regulated a whole host of activities.  Long standing regulation, by itself, does not suggest that the regulated activity was a traditional, exclusive prerogative of the State.  Accordingly, the public function test is not met in this case.

The Court recognizes that *Rawson* concluded that extended involuntary commitment is "in some sense caused by the State's exercise of its right, pursuant to both its police powers and *parens patriae* powers." 975 F.3d at 752.  The Court discusses this aspect of the *Rawson* decision in more detail below.  But in short, *Rawson* found that a private corporation involuntary committing an individual supported its conclusion that the

corporation was a state actor. *Id.* Though it is unclear how heavily the *Rawson* court was influenced by this finding, this Court must similarly conclude that the CBI Defendants' participation in Arizona's civil commitment scheme weighs in favor of a finding of state action. Still, the *Rawson* court did not reach this conclusion by applying the traditional public function test. *See id.* at 751 n.8.

### 2. *The State Compulsion Test*

The Court turns next to the state compulsion test. The compulsion test is met where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). As the Court found in the October Order, it is not alleged that the CBI Defendants committed Castillo pursuant to the government's "coercive influence" or "significant encouragement." *See Kirtley*, 326 F.3d at 1094. Plaintiffs do not contest this conclusion. Neither does the SAC allege any facts implicating the state compulsion test. Accordingly, the Court finds that the SAC fails to establish that the CBI Defendants were acting pursuant to any external state coercion or encouragement. Nonetheless, the Court will revisit this concept later in its state actor inquiry.

### 3. *The Joint Action and Close Nexus Tests*

Finally, the Court considers whether there is state action under the joint action and close nexus tests.[2] *Rawson* summarized these tests as follows:

> The close nexus and joint action tests may be satisfied where the court finds a sufficiently close nexus between the state and the private actor so that the action of the latter may be fairly treated as that of the State itself, or where the State has so far insinuated into a position of interdependence with the private party that it was a joint participant in the enterprise.

975 F.3d at 748 (citation modified). These tests are not satisfied where private parties are "merely subject to extensive regulation or subsidized by state funds." *Id.* at 757.

Plaintiffs contend that there is a "complex, cohesive system set up by the Board of

---

[2] As noted in the October Order, courts often employ the joint action and nexus tests in tandem as both tests essentially measure the interrelation between actions of the State and the private party. *See, e.g.*, *Jensen*, 222 F.3d at 574; *Doe v. Rosenberg*, 996 F. Supp. 343, 352 (S.D.N.Y. 1998); *Estades-Negroni v. CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 6 (1st Cir. 2005).

Supervisors and CBI." (Doc. 230 at 5.) Plaintiffs suggest that there is state action based on allegations of "collaboration between the County, particularly through the Yuma County Attorney, law enforcement, and CBI in developing and implementing the Title 36 process, the delegation of the County to CBI to formulate and implement its own policies, and the direct involvement of the Yuma County Attorney in the review and approval of Petitions for Court Ordered Evaluations." (Doc. 231 at 7.)

The Court's analysis of Plaintiffs' contentions is twofold. First, the Court compares this case to the Ninth Circuit's recent opinion in *Rawson*, which similarly dealt with the question of whether a private behavioral health facility was a state actor based on a civil commitment. The Court then separately considers the remaining facts of this case not addressed by *Rawson*. The Court recognizes that *Rawson*'s analysis was not strictly confined to joint action and nexus tests. *See* 975 F.3d at 748, 751. Instead, *Rawson* engaged in a more general enterprise of examining facts suggesting that "the defendant has exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 748 (citation modified). This Court does the same but does so under the joint action and nexus test given that the public function and governmental compulsion tests are plainly inapplicable here. Thus, this Court uses the joint action and nexus tests as a catchall of sorts.

### a. Rawson

The facts of *Rawson* are as follows. On March 4, 2015, Washington law enforcement "took Rawson into protective custody, placed him on a mental hold, and transported him by ambulance to a general hospital" after Rawson had a mental breakdown in a local bank. 975 F.3d at 745. This "triggered a series of events generally governed by Washington's Involuntary Treatment Act (ITA)." *Id.*

"At the hospital, a Clark County Designated Mental Health Professional (DMHP), [pursuant to the ITA,] evaluated Rawson and filed a petition in state court for a 72-hour involuntary commitment." *Id.* The DMHP then had Rawson taken to Recovery Innovations, Inc. ("RII"), "a private nonprofit corporation" that operated in facilities leased

- 16 -

from Washington on the grounds of a Washington owned hospital—Western State Hospital. *Id.* at 745–746. RII's medical director, Dr. Halarnakar, was also a full-time physician with Western State Hospital. *Id.* at 746.

Rawson was taken to RII where he was evaluated by RII employees. *Id.* The RII employees successfully petitioned a Washington court for "an additional 14 days of intensive treatment." *Id.* The petition was based on the evaluation and information contained in the initial police report. *Id.*

Rawson was then evaluated by Dr. Halarnakar who concluded that Rawson needed further treatment. *Id.* Dr. Halarnakar petitioned the court for an additional 90-day commitment. *Id.* "Rawson exercised his right to request a jury trial, which was continued multiple times while he remained involuntarily committed at RII." *Id.* "In preparation for the trial, Dr. Halarnakar . . . communicated extensively with the Pierce County Deputy Prosecuting Attorney regarding discharge possibilities, current treatment methods, the strength of the evidence against Rawson, and the theory to argue to the jury." *Id.* Ultimately, Rawson was released and brought § 1983 claims "against RII and many of the individuals involved in his commitment" (the "RII Defendants"). *Id.* Rawson alleged the RII Defendants "involuntarily committ[ed] him without legal justification, knowingly provid[ed] false information to the court, and forcibly inject[ed] him with antipsychotic medications without his consent." *Id.* at 747.

Though the *Rawson* court identified the conventional four tests that courts generally use to identify state action, its analysis does not neatly fit within any one of those tests. *See id.* Instead, the court identified certain "facts that played a material role in previous decisions." *Id.* at 751. The court recognized that it is not settled law "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound [state actor] inquiry." *See id* at 747–748 (quoting *Lugar*, 457 U.S. at 939). Accordingly, the court identified six facts—or factors[3]—it determined

---

[3] The *Rawson* court did not explicitly identify its mode of analysis as a "factor test." However, like a conventional factor test, *Rawson* evaluated certain facts under six general inquiries and determined that satisfaction of any one inquiry weighed in favor of state action. Nevertheless, the Court finds that the "*Rawson* factors" are not outcome

- 17 -

weighed in favor of finding that the RII Defendants were state actors.  Some, but not all of these factors are present here.

First, the *Rawson* court considered to what extent the "state significantly involve[d] itself in the private parties' actions and decisionmaking at issue." *Id.*  The court conceded that the RII Defendants "did not work in coordination with mental health professionals acting in their capacity as county or state employees."[4]  *Id.* at 753–54.  But the court went on to note that "mental health professionals were not the only relevant actors . . . the county prosecutor played an outsized role in the duration of Rawson's detention, particularly during the pendency of Rawson's jury trial on the 90-day petition." *Id.* at 754.  The court emphasized that the RII Defendants "communicated extensively with the prosecutor regarding discharge possibilities, current treatment methods, the strength of the evidence against Rawson, and the theory to argue to the jury." *Id.*  Additionally, "the prosecutor was heavily involved in the decisionmaking process regarding Rawson's detention, diagnosis, and treatment."  The Court also noted that, under Washington law, "civil commitment petitions [can] be argued only by the county prosecutor," thus, the RII Defendants "cooperate[d] with the executive arm of the State to further the *State's* interest in protecting both the public and the patient." *Id.* (emphasis in original).

Second, the court next considered to what extent the state "authorized or approved" the RII Defendant's actions. *Id.* at 754–55.  The court noted that "much of the challenged activity received clear state imprimatur" because the RII Defendants needed a state court to approve its petition before they could "forcibly treat a mental health patient past an initial 72-hour emergency evaluation." *Id.* at 755.  The state court approved the RII Defendants' petition which is significant given that it "unquestionably ha[d] the power to disapprove [the] petition." *Id.*  "Accordingly, the role of state authorization and approval weigh[ed] in favor of a finding of state action." *Id.*

determinative.  Instead, the Court coopts the *Rawson* factors as a part of its broader, "fact-intensive analysis." *See* 975 F.3d at 751.

[4]  Although Dr. Halarnakar was a full-time physician at the State psychiatric hospital, the court noted that the record did "not reveal whether or the extent to which [the state hospital], through Dr. Halarnakar, may . . . have been involved in the administration of RII's Lakewood facility." *Rawson*, 975 at 754 n.12.

- 18 -

Third, *Rawson* also noted "that state action may lie in private conduct that is 'affirmatively commanded' by state protocols." *Id.* There, the RII Defendants were "charged with applying state protocols and criteria in making evaluation and commitment recommendations, and [were] affirmatively commanded by the state to render treatment without informed consent in many circumstances." *Id.* (citation modified).

Fourth, *Rawson* also found that civil commitment, by itself, is "in some sense caused by the State's exercise of its right, pursuant to both its police powers and *parens patriae* powers" and therefore "weigh[ed] in favor of finding that Defendants acted under color of state law." *Id.* at 752. Thus, the "[RII] Defendants were clothed with the authority of state law when they detained and forcibly treated Rawson beyond the initial 72-hour emergency evaluation period." *Id.* (citation modified). Of note, Rawson was committed for fifty-five days and received extensive treatment during that time. *See id.* at 745.

The two remaining factors are not worth an in-depth analysis given that they are readily dealt with here. First, *Rawson*'s state actor determination partially rested on the fact that RII leased space from the state. *Id.* at 756. Here, the SAC does not allege that CBI operated on public property or in public facilities. This factor thus cuts against finding state action. Second, the court found that "the State has a Fourteenth Amendment obligation toward those whom it has ordered involuntarily committed" and therefore "weighs toward a finding of state action." *Id.* at 753. This factor is met here—and practically speaking—in any case arising out of a civil commitment. Because no court has found that civil commitment is invariably state action, this factor alone does not compel the conclusion that the CBI Defendants were state actors. Still, this factor weighs in Plaintiffs' favor.

Lastly, the Court notes that *Rawson*, in large part, sought to correct a mistake percolating in the lower courts. Prior to *Rawson*, some district courts limited their state action inquiry—in the civil commitment context—to determining whether "the state's involvement in the decision-making process overrode the private provider's purely medical judgment." *Id.* at 750 (citation modified). The court clarified that "[a] finding that

- 19 -

individual state actors or other state requirements literally 'overrode' a nominally private defendant's independent judgment might very well provide relevant information. But it is a mistake to focus too narrowly on this question." *Id.* at 751. Thus, while the fact that civil commitments are the product of "purely medical judgments" weighs against state action, it is not outcome determinative. *See id.*

### b. Applying Rawson

The Court now considers the four remaining factors.

### i. State Involvement

The Court begins by evaluating whether the SAC plausibly alleges that the "state significantly involve[d] itself in the private parties' actions and decisionmaking at issue." As was the case in *Rawson*, Plaintiffs here do not allege that the CBI Defendants "work[ed] in coordination with mental health professionals acting in their capacity as county or state employees." *See id.* at 753–54. However, this is not outcome determinative as a state actor "play[ing] an outsized role in the duration of [Castillo's] detention" is sufficient to support a finding of state action. *See id.* at 754.

Plaintiffs, in their briefing, argue that the Yuma County attorney played such a role because he "had to review and approve" the petition to have Castillo evaluated.[5] (Doc. 230 at 15.) Plaintiffs also contend that under "A.R.S. § 36-521(G), when CBI proposes to petition for court ordered evaluation on the ground that the subject is a danger to others (what was alleged against Mrs. Castillo), CBI is required to contact the [County Attorney] for review and her written recommendations. If the County Attorney recommends the petition be filed, CBI is required to append a copy of the written recommendation to the petition. A.R.S. § 36-523(C)." (Doc. 231 at 3–4.) More generally, Plaintiffs also contend that "collaboration between the County, particularly through the Yuma County Attorney, law enforcement, and CBI in developing and implementing the Title 36 process, the delegation of the County to CBI to formulate and implement its own policies, and the direct

---

[5] The SAC does not directly assert that the CBI Defendants obtained the County Attorney's recommendation. Neither does the SAC describe what the County Attorney's recommendation was in this case.

- 20 -

involvement of the Yuma County Attorney in the review and approval of Petitions for Court Ordered Evaluations, all point irrefutably to state action." (*Id.* at 7.)

Plaintiffs' allegations fall short of what the *Rawson* court deemed relevant in concluding that the "county prosecutor played an outsized role in the duration of Rawson's detention." *See* 975 F.3d at 754. Unlike *Rawson*, Plaintiffs do not allege that the Yuma County Attorney—or any state actor—communicated extensively with the CBI Defendants regarding Castillo's discharge or current treatment methods. *See id.* Neither do Plaintiffs allege that any state actor "was heavily involved in the decisionmaking process regarding [Castillo's] detention, diagnosis, [or] treatment." *See id.*

Instead, Plaintiffs rely on § 36-521(G), which provides that "[i]f a petition for court-ordered evaluation alleges danger to others . . . the screening agency, before filing such a petition, shall contact the county attorney for a review of the petition." Under this statute, the county attorney can make one of three recommendations: (1) "[t]hat a criminal investigation is warranted; (2) "[t]hat the screening agency shall file the petition"; or (3) "[t]hat no further proceedings are warranted." *Id.* However, the county attorney's recommendation is not compulsory. Section 36-521(G)(3) goes on to provide that "[t]he screening agency shall consider the recommendation in determining whether a court-ordered evaluation is justified and shall include the recommendation with the petition if the agency decides to file the petition with the court." Accordingly, the county attorney's recommendation is non-binding on the screening agency.

Of course, the foregoing statute is not irrelevant to the state actor inquiry. The CBI Defendants being statutorily obligated to obtain the County Attorney's recommendation under certain conditions points to some level of involvement between the state and the CBI Defendants. However, this level of involvement is more modest than what was present in *Rawson* and is by itself insufficient to make the CBI Defendants and the state joint participants in a coordinated enterprise. Plaintiffs fail to identify another state actor who significantly influenced any of the decisions made by the CBI Defendants regarding Castillo's commitment.

At a general level, the SAC alleges that Hogeboom "was the final decision maker in CBI with regard to formulation and implementation of policies and procedures regarding the organization's obligations under Title 36." (Doc. 213 at 3 ¶ 6.)  Unlike in *Rawson* where law enforcement initiated the civil commitment, Castillo's daughter—a private citizen—applied to have Castillo committed.  *See* 975 F.3d at 745.  Additionally, unlike *Rawson*, CBI staff initially evaluated Castillo rather than state health professionals.  *See id.* Accordingly, CBI staff petitioned a state court to have Castillo committed whereas the state health professionals in *Rawson* initiated the petition with the state court.  *See id.*

Additionally, Plaintiffs do not suggest that the State overrode the CBI Defendants' purely medical judgements.  *Rawson* plainly acknowledges that this fact—although not outcome determinative—weighs against the finding of state action.  *See id.* at 751.

The Court acknowledges that while the state was not involved in the *decisionmaking* surrounding Castillo's initial commitment, the state was remotely involved in the *actions* taken by CBI to have Castillo committed.  For example, local police transported Castillo to CBI and a state court granted the petition to have Castillo committed for up to three additional days. (Doc. 213 at 22 ¶ 73, 29 ¶ 106.)  Construed generously, these allegations only slightly contribute to a finding of state action.  As noted in the October Order, police merely transporting Castillo to CBI does not independently suggest that CBI was carrying out a "complex and deeply intertwined process" with the state.  *See Jensen*, 222 F.3d at 573; *see also Ellison*, 48 F.3d at 197 (noting the police transporting a plaintiff to a hospital did not give rise to state action, in part, because the officers became involved only on a private citizen's initiative).

On balance, the alleged state involvement in Castillo's commitment falls well short of what was present in *Rawson*.  Plaintiffs do not allege enough facts demonstrating that the state was significantly involved in either the actions or decisionmaking surrounding Castillo's commitment.  At bottom, a private citizen initiated Castillo's initial evaluation; private medical professionals initially evaluated Castillo; these professionals then petitioned to have Castillo committed for further evaluations; and these professionals

performed the further evaluations.  Accordingly, this factor does not weigh in favor of finding state action.  However, "Defendants are not removed from the purview of § 1983 simply because they are professionals acting in accordance with professional discretion and judgment."  *Atkins*, 487 U.S. at 52.

ii.   State Authorization

The Court next evaluates whether "the state authorized or approved the [CBI Defendants] actions."  *Rawson*, 975 F.3d at 754.  In *Rawson*, the court found that "much of the challenged activity received clear state imprimatur [because] [m]edical providers in Washington can neither detain nor forcibly treat a mental health patient past an initial 72-hour emergency evaluation period without a court order."  *Id.* at 755.  The Court must therefore reach the same conclusion here because Castillo could not have been kept for further evaluation without a court order.  *See* § 36-520 *et seq.*

However, it is unclear how suggestive this finding is of state action.  Surely, the CBI Defendants could not have continued evaluating Castillo without a court order.  However, the Supreme Court recognizes that "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action."  *Sullivan*, 526 U.S. at 52.  Indeed, the *Sullivan* Court noted that "challenged decisions are [not] state action because [private actors] must first obtain 'authorization' or 'permission'" from the State before undertaking certain actions.  *See id.* at 54.  Further, *Sullivan* makes clear that State authorization of certain behaviors does not make the underlying behavior attributable to the state.  *Id.* at 52.

Again, the challenged conduct in this case is Castillo's commitment and evaluation.  As noted, a private citizen applied for Castillo's commitment and the CBI Defendants initiated Castillo's evaluation.  In other words, the state was not involved in instigating or facilitating Castillo's initial commitment.  Thus, it is unclear if the state court approving the petition to have Castillo evaluated amounts to an "exercise[] [of] coercive power" or "significant encouragement" which is highly indicative of state action.  *See Blum*, 457 U.S. at 1004.  Although the CBI Defendant's received State approval, the State did not seek Castillo's commitment.

- 23 -

Accordingly, in accord with *Rawson*, Court finds that "the role of state authorization and approval weighs in favor of a finding of state action in this case." 975 F.3d at 755. However, the weight afforded to this conclusion is heavily tempered by *Sullivan*, which found that "mere approval or acquiescence of the State is not state action." 526 U.S. at 52.

iii.   State Protocols

The Court next evaluates whether the CBI Defendants' conduct was "affirmatively commanded" by state protocols.  In *Rawson*, the RII Defendants were "charged with applying state protocols and criteria in making evaluation and commitment recommendations, and [were] affirmatively commanded by the state to render treatment without informed consent in many circumstances." 975 F.3d at 755 (citation modified). The court's conclusion relied on two Washington statutes. *Id.*  The first "provide[d] that a detained individual shall receive such treatment and care as his or her condition requires, regardless of whether that individual consents to treatment, except in some circumstances regarding antipsychotic medications within 24 hours of a trial or hearing." *Id.* at 755 n.13 (citation modified).  The second "provide[d] that the department shall develop statewide protocols to be utilized by professional persons and DMHPs in administration of this chapter.  The protocols shall provide uniform development and application of criteria in evaluation and commitment recommendations, of persons who have, or are alleged to have, mental disorders and are subject to this chapter." *Id.* (citation modified).

Plaintiffs contend that the "instant case presents the same protocols.  The comprehensive scheme governing seizure and evaluation, set out in the SAC, is accompanied by protocols governing involuntary treatment." (Doc. 230 at 16.)  Plaintiffs note that Arizona has statutes like those in *Rawson*.  For example, Arizona also has a statute that provides that "[t]he administration[6] and its contractors shall monitor the performance of an agency providing [evaluation] services." A.R.S. § 36-502(A).  That same statute provides that "[t]he director[7] shall adopt rules that include standards for agencies . . . when

---

[6] The administration is the Arizona health care cost containment system administration ("AHCCCSA"). § 36-501(1).
[7] The director is the director of AHCCCSA. § 36-501(12).

providing [evaluation] services and shall prescribe forms as may be necessary for the proper administration and enforcement of this chapter." § 36-502(B).

The Court finds that the "affirmatively commanded" factor does not compel a finding of state action here. This factor was discussed in *Blum*[8] where the Supreme Court declined to find that state regulations affirmatively commanded private behavior where the complained of conduct "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Blum*, 457 U.S. at 1008. The same is true here. Of course, the commitment process is heavily regulated by the State, however, Castillo's commitment was the product of an application by a private citizen and an evaluation by CBI employees. Again, Arizona law gives evaluation agencies the discretion to deny applications for evaluation, § 36-520(J) and -521(C), and the discretion to release individuals from evaluation based on "the opinion of the medical director of the agency," § 36-531(A). As another court noted, there is no state action where a state's "civil commitment statutes neither compel nor encourage the private initiation of commitment proceedings [but] merely authorize and regulate the commission of such acts." *Bass*, 180 F.3d at 243. Such is the case here. At bottom, Plaintiffs do not establish that the State affirmatively commanded the CBI Defendants to evaluate Castillo.

iv.   State Civil Commitment Power

Finally, the Court considers the State's civil commitment powers generally. On the one hand, this factor, as applied by *Rawson*, plainly weighs in Plaintiffs' favor. Again, the *Rawson* court found that civil commitments are, "in some sense[,] caused by the State's exercise of its right, pursuant to both its police powers and *parens patriae* powers." 975

---

[8] *Rawson* noted that:

> The Supreme Court has also reasoned that state action may lie in private conduct that is "affirmatively commanded" by state protocols. In *Blum*, for example, the Supreme Court highlighted that if it had been the case that the State "affirmatively commands" nursing homes to summarily discharge or transfer Medicaid patients thought to be inappropriately placed there, "we would have a different question before us."

975 F.3d at 755 (quoting *Blum*, 547 U.S. at 1005). It is unclear to what extent the "affirmatively commanded" consideration differs from the state compulsion test.

- 25 -

F.3d at 752.  However, this factor is not the boon Plaintiffs hope it to be.

To start, the Court questions the weight to afford this factor given that it is ostensibly met in any civil commitment case.  Furthermore, it appears that *Rawson*'s conclusion depended, in part, on the fact that Rawson was deprived "of his liberty for an extended period of involuntary civil commitment"—fifty-five days.  *See id.*  Here, Castillo was evaluated for four days and was not kept for involuntary treatment.  Additionally, there are other facts in this case which suggest that the State merely having an interest in civil commitments does not create state action.  The Court thus evaluates Plaintiffs' arguments suggesting that the CBI Defendants are state actors based on the State's interest in civil commitments.

The Court first addresses Plaintiffs' argument that there is state action here given that the Agreement was entered into pursuant to a statutory mandate.  Under Arizona law, the County was required to "provide directly or by contract the services of a screening agency and an evaluation agency."  A.R.S. § 36-545.06(A).  Additionally, "[f]or a person who is admitted to an evaluation agency for a court-ordered evaluation, the county's responsibility continues until the evaluation period ends, which is when one of the following occurs:" (1) "[t]he petition for court-ordered treatment is filed with the court"; (2) "[t]he individual agrees to voluntary treatment"; or (3) "[t]he individual is released from court-ordered evaluation."  § 36-545.06(D).  Of course, these statutes reinforce *Rawson*'s conclusion that states have an inherent interest in civil commitments.  However, the State having a mere interest in civil commitments, as evidenced by these statutory mandates, does not render the CBI Defendants state actors.

To start, the foregoing statutes do little to connect the County to "the specific conduct of which [Plaintiffs] complain."  *Blum*, 457 U.S. at 1004.  "[A] State normally can be held responsible for a private decision *only when it has exercised coercive power or has provided such significant encouragement*, either overt or covert, that the choice must in law be deemed to be that of the State."  *Id.* (emphasis added).  The County being statutorily obligated to provide commitment services does not show that the County coerced or

encouraged civil commitments.

The court in *Doe v. Harrison*, 254 F. Supp. 2d 338 (S.D.N.Y. 2003) addressed a similar argument. There, a claimant argued that private hospitals are state actors because they "assume[] the State's civil commitment responsibility." *Id.* at 344. The court disagreed, noting that "the privatization of an activity such as civil commitment that is not a 'public function,' [and] does not mandate an analogous constitutional scrutiny of private actors performing the activity." *Id.*

Additionally, other courts have similarly found that private facilities acting as "county delegated" evaluation and treatment facilities are not state actors. *See, e.g.*, *Walsh v. AMD Sacramento*, No. 2:13-CV-2077 MCE KJN, 2014 WL 4472752, at *11 (E.D. Cal. Sept. 11, 2014). The *Walsh* court noted that a private entity being a "county designated" facility "is insufficient to show the existence of a conspiracy or joint action between state officials" and the private entity. *See id.*

Furthermore, it does not appear that CBI is the sole provider of evaluation services in the County. Although there was some confusion on this point at oral argument, Arizona's civil commitment scheme plainly tolerates the presence of multiple evaluation agencies. Indeed, it appears there are multiple evaluation agencies operating in Yuma County. *See, e.g.*, *Mental Health Co-Responder Unit*, City of Yuma, https://www.yumaaz.gov/government/yuma-police-department/services-programs/mental-health-co-responder-unit (last visited March 12, 2026); *Locations*, Horizon Health and Wellness, https://www.hhwaz.org/locations/ (last visited March 12, 2026).

This case presents only some of the facts relevant to the *Rawson* court's ultimate finding of state action. However, *Rawson* is not the final word on whether a civil commitment amounts to state action. As *Rawson* acknowledged, the state actor determination is a fact-bound inquiry that is applied on a case-by-case basis. 975 F.3d at 747. Thus, the Court broadens its analysis to consider the facts of this case which were not implicated in *Rawson*—namely, the facts surrounding the Agreement.

c.  The Agreement

The remaining facts Plaintiffs rely on in arguing that the CBI Defendants are state actors primarily stem from the Agreement.  In the October Order, the Court noted that while a contractual relationship might contribute to a close nexus between a state and private actor, it is—by itself—insufficient to evidence substantial intertwinement between the State and CBI.  *See Belgau v. Inslee*, 975 F.3d 940, 948 (9th Cir. 2020) ("A merely contractual relationship between the government and the non-governmental party does not support joint action; there must be a symbiotic relationship of mutual benefit and substantial degree of cooperative action." (citation modified)).  Indeed, the Supreme Court recognized that "[a]cts of . . . private contractors do not become acts of the government by reason of their significant *or even total engagement* in performing public contracts." *Rendell*, 457 U.S. at 841 (emphasis added).

The Court acknowledges that the SAC includes additional allegations about the substance of the Agreement that demonstrates a higher degree of entwinement between the CBI Defendants and the County.  However, these allegations are still too modest to plausibly suggest that the CBI Defendants are state actors.  The SAC alleges that the Agreement designated "CBI to represent the County at public meetings" and outlined various ways that CBI was required to collaborate with the Yuma County Attorney.  (Doc. 213 at 14 ¶ 42.)  For example, the Yuma County Attorney is alleged to have been responsible for appointing "Court Liaisons" such as Carrasco.  (*Id.*)  Additionally, the Yuma County Attorney is alleged to have been responsible for educating the CBI Defendants on County procedures surrounding the filing of petitions for court ordered evaluations.  (*Id.* at 15 ¶ 42.)  Of course, these allegations point to some level of involvement between the County and CBI.  However, the collaboration between CBI and the County is mostly unrelated to Castillo's commitment and fails to suggest that any County employee was "heavily involved in the decisionmaking process" surrounding Castillo's commitment, as was the case in *Rawson*.  *See* 975 F.3d 754.  Neither do these allegations plausibly outline that the County materially inserted itself into CBIs

commitment decisions generally.  At bottom, it appears that CBI retained discretion in how it would treat and evaluate its patients.

The Court also points out that its finding is not an anomaly.  Indeed, most circuits find that private civil commitments do not give rise to state action.  *See, e.g.*, *Harvey v. Harvey*, 949 F.2d 1127 (11th Cir. 1992); *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254 (1st Cir. 1994); *Ellison*, 48 F.3d at 196; *Pino v. Higgs*, 75 F.3d 1461 (10th Cir. 1996); *Doe v. Rosenberg*, 166 F.3d 507 (2nd Cir. 1999); *Bass*, 180 F.3d at 243.  Although *Rawson* reaches an opposite conclusion, the facts of *Rawson* are unique and, as made clear, materially different than this case.

### d.  Conclusion

Because the SAC fails to demonstrate that the CBI Defendants are state actors, the Court dismisses Plaintiffs' § 1983 claims with prejudice.  To recap, the Court finds that this case does not implicate the public function or governmental compulsion tests.  Dismissal with prejudice is appropriate here given Plaintiffs' repeated inability to plausibly plead state action.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (noting that dismissal with prejudice is appropriate where claimants have had multiple opportunities to amend their complaint).

### C.  The *Monell* Claims

The Court now discusses the *Monell* claims against CBI, Hogeboom, and the Board.  The SAC must sufficiently allege that a constitutional violation was caused by an official policy or custom of the Board and CBI.  *See Tsao*, 698 F.3d at 1139.  A "plaintiff may recover under *Monell* under one of three theories."  *Fosbinder v. County of San Diego*, No. 24-CV-733-RSH-SBC, 2024 WL 4631275, at *10 (S.D. Cal. Oct. 30, 2024).  First, an entity "may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'"  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (quoting *Monell*, 436 U.S. at 708).  Second, an entity "may be held liable under § 1983 for acts of omission, when such omissions amount to the local government's own official policy."  *Id.* (citation modified).  Third, an entity "may be held

liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id.* at 1250 (citation modified).  At the outset, the Court dismisses the *Monell* claim against CBI because it is not a state actor. *See Tsao*, 698 F.3d at 1139.   The Court also briefly addresses the claims against Hogeboom.

The Court is not sure what to make of Plaintiffs' claims against Hogeboom. Plaintiffs purport to sue Hogeboom in his individual capacity.   (Doc. 213 at 3 ¶ 6.) However, personal-capacity suits under § 1983 are predicated on personal participation in the alleged constitutional violation.  *Nelson v. County of Sacramento*, 926 F. Supp. 2d 1159, 1165 (E.D. Cal. 2013).   Hogeboom was not a personal participant in Castillo's commitment.  Instead, he was a final policymaker for CBI and Plaintiffs allege that said policy was unconstitutional and was the moving force behind Castillo's injuries.  Thus, it appears Plaintiffs intend to sue Hogeboom under *Monell*.   However, "a *Monell* claim can only be brought against an individual defendant in his official capacity" and "[a]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Gagne v. City of Mesa*, No. CV-24-01337-PHX-SHD, 2025 WL 2257508, at *9 (D. Ariz. 2025) (citation modified).  Thus, "[w]hen both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant."  *Id.* (citation modified). Accordingly, all claims asserted against Hogeboom are dismissed with prejudice as they should be directed at CBI.  This leaves only the *Monell* claim against the Board.

The Board argues that "Plaintiffs' *Monell* claim can begin, and end, with the conclusion that Plaintiffs failed to plausibly show that a public official inflicted a constitutional harm."  (Doc. 219 at 4.)  At bottom, the Board contends that "there are no factual allegations alleging a constitutional injury inflicted as a result of a policy, practice, or custom of the County, or a municipal failure to train or supervise."  (*Id.*)  The Court agrees.

- 30 -

The SAC alleges that the Board violated Plaintiff's constitutional rights based on its "deliberate[] indifference to the violations being committed by its agent and . . . not requir[ing] CBI to conform its practices and procedures to due process." (Doc. 213 at 27 ¶ 93.) The practices and procedures complained of here are the CBI policies treating AFEs as AEAs. (*Id.* at 18 ¶ 54.) Plaintiffs contend that this: (1) allows CBI to avoid the AFE's prepetition screening process; (2) "authorizes the Admitting Officer to determine whether or not a person is in imminent danger to self or others without requiring the Admitting Officer to conduct an assessment based on the evidence required by the AEA"; and (3) "direct[s] the Admissions Coordinator to prepare and issue an Order for Apprehension and Transport, commencing the seizure of the subject of the AFE, without legal authority." (*Id.* ¶ 55.)

Plaintiffs also allege that under CBI's policies, "subject[s] of [an] AFE will automatically be assigned a mental disorder diagnosis and detained in the 23 Hour Crisis Protocol, eliminating the statutory requirement that the Admitting Officer, before making such an order, conduct a psychiatric and physical examination of the person to determine if there is reasonable cause to order the detainment." (*Id.* at 18–19 ¶ 56.) Additionally, CBI's policies are alleged to allow a person to be detained without assessment and admitted as a patient "without having undergone a full psychiatric examination required at the time of presentation." (*Id.* at 19 ¶¶ 57–58.)

The SAC continues, alleging that CBI policies allow PCOEs to be drafted that "confirm[] the inpatient admission on the basis of allegations contained in an AFE or AEA, and for the Medical Director to execute the [PCOE] without having reviewed the medical record to confirm that the allegations have been found to be accurate and the person suffers from a mental disorder, causing her to be a danger to self or others right now." (*Id.* at 19 ¶ 59.) Plaintiffs allege that these policies "were the moving force behind the constitutional violations." (*Id.* at 20 ¶ 63.) The SAC alleges that Hogeboom instituted these policies. (*Id.* at 18–20.)

Even assuming these policies caused the requisite constitutional injury, the SAC

does not allege that the Board had any concrete involvement in crafting these policies. The SAC alleges that Hogeboom implemented the AEA/AFA policies. (*Id.* at 17–18.) The SAC does not allege that Hogeboom collaborated with the Board, or any of its agents, in setting these policies. Indeed, the SAC alleges that the Board was "[t]hrough its agent, the Yuma County Attorney, . . . put on notice of the policies instituted by Hogeboom." (*Id.* at 27 ¶ 93.) The SAC goes on to allege that the Board "was deliberately indifferent to the violations being committed by its agent and did not require CBI to conform its practices and procedures to due process." (*Id.*) Thus, the SAC does not allege that the Board, or any state actor, was responsible for developing the complained of policies.

Additionally, it is unclear what "theory" of *Monell* liability Plaintiffs seek to hold the Board liable under. It appears that Plaintiffs argue that the Board should be liable based on its failure to act and/or its implicit ratification of CBI's policies. (Doc. 238 at 4–5.) These theories are not meaningfully developed in the SAC. The SAC merely lodges boilerplate accusations that the Board was "on notice" of CBI's policies. (Doc. 213 at 27 ¶ 93.) To the extent the SAC attempts to lodge a ratification claim, the SAC fails to "include factual allegations about actions that [the Board] took in connection with their 'approval' of the misconduct." *See Green v. California Dep't of Corr. & Rehab.*, No. 1:23-CV-01108-JLT-SAB, 2023 WL 8113871, at *11 (E.D. Cal. Nov. 22, 2023) (citation modified).

Additionally, even the SAC's allegation that the Board was on notice of CBI's policies is facially implausible. Again, the SAC alleges that the Board was put on notice of CBI's policy "[t]hrough its agent, the Yuma County Attorney." (*Id.*) The Yuma County Attorney is not an "agent" of the Board. The Arizona Supreme Court recently made clear in *Sanchez v. Maricopa County*, 572 P.3d 101, 107 (Ariz. 2025) that "the relationship between a board and other county officers [is not] 'hierarchical.'" The court went on to note that there is no "supervisory relationship between a board and a sheriff." *Id.* at 107. *Sanchez*'s holding easily extends to county attorneys, who are similarly situated in county government. *See id.*; Ariz. Const. art. 12, § 3. The SAC does not otherwise allege any

facts suggesting that the Yuma County Attorney acts as a "agent" of the Board. Neither does the SAC allege any other facts suggesting that the Board was made aware of the allegedly unconstitutional policies.

At bottom, the SAC attempts to hold the County liable for the policies of its private independent contractor. This claim is too far afield of the purpose of *Monell* claims, which is to "attach [liability] where the municipality itself causes the constitutional violation through the execution of an official policy, practice or custom." *Fairley v. Luman*, 281 F.3d 913, 916 (9th Cir. 2002). Such allegations are not present here. Thus, the Court dismisses the claims against the Board with prejudice.

### D. Count XI: Judicial Deception

The Court turns next to Castillo's judicial deception claim against CBI, Carrasco, and Caldwell. Judicial deception is type of § 1983 claim intended to vindicate the "constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1146 (9th Cir. 2021). This claim can only be brought against state actors. *See Fidler v. Arizona*, No. 23-15691, 2024 WL 1553703, at *1 (9th Cir. Apr. 10, 2024). The Court dismisses this claim with prejudice because the CBI Defendants are not state actors for the reasons discussed.

### E. Count XII: § 1983 Conspiracy

The Court next considers Plaintiffs Conspiracy claim against all Defendants. "To allege a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must allege which defendants conspired, how they conspired and how the conspiracy led to a deprivation of the plaintiff's constitutional rights." *Arruda ex rel. Arruda v. County of Los Angeles*, 373 F. App'x 798, 799 (9th Cir. 2010) (citation modified). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (citation modified). "This agreement or meeting of the minds may be inferred on the basis of circumstantial evidence, such as the actions of the defendants." *Steel v. City of San*

*Diego*, 726 F. Supp. 2d 1172, 1179 (S.D. Cal. 2010).

The SAC alleges that the Defendants' actions "were done by agreement to deprive Plaintiffs, and others similarly situated, rights under the First, Fourth and Fourteenth Amendments to the constitution." (Doc. 213 at 31 ¶ 116.)  The SAC goes on to allege that the "individual CBI Defendants were brought into the conspiracy upon CBI instituting the policies set forth above, and those Defendants being informed of the policies and undertaking to carry them out." (*Id.* ¶ 118.)  "The policies intended to deprive Plaintiffs of their rights, which were agreed to by the Board." (*Id.* at 32 ¶ 119.)

As a practical matter, this claim adds nothing to this case because "conspiracy is not itself a constitutional tort under § 1983 and is generally used to enlarge the pool of responsible defendants by demonstrating their causal connections to the underlying constitutional violation." *Garcia v. Smith*, 666 F. App'x 581, 586 n.5 (9th Cir. 2016) (citation modified).  The conspiracy claim here does not enlarge the pool of defendants. Instead, the conspiracy alleged is a conspiracy to violate the same constitutional rights that Plaintiffs' other claims are predicated on.  Thus, it is unclear why Plaintiffs bring this claim, much less why they waited until their SAC to do so.

Nonetheless, the SAC does not plausibly allege a § 1983 conspiracy.  The only state actor in this case is the Board.  Thus, "to prove a conspiracy between the state and private parties under section 1983, [Plaintiffs] must show an agreement or meeting of the minds to violate constitutional rights." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540–41 (9th Cir. 1989) (citation modified).

At bottom, the SAC does not outline how the Board conspired with CBI, Hogeboom, Andjelich, Caldwell, Michael, or Carrasco and shared a "unity of purpose or a common design and understanding" to deprive Plaintiffs of their constitutional rights. *See Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012) (citation modified).  The SAC merely alleges that multiple Defendants participated in a process that ultimately deprived Plaintiffs of their constitutional rights.  This fact standing alone, however, does not plausibly suggest that the Defendants' conscious object was to deprive Plaintiffs of

their constitutional rights. Additionally, the SAC suggests that CBI's policies evidence a conspiracy. (Doc. 231 at 31 ¶ 118.) However, these policies were ostensibly in place before Castillo had any contact with CBI. At bottom, Plaintiffs' conspiracy claim alleges that Defendants developed a commitment process generally designed to deprive people of their constitutional rights. Even ignoring the deficiencies in the SAC's presentation of this claim, Plaintiffs cite no authority suggesting that this type of allegation can give rise to a § 1983 conspiracy claim. Thus, the Court dismisses the conspiracy claim with prejudice.

### F. State Law Claims

The Court next considers Plaintiffs' state law claims of defamation and battery.

#### 1. *Count XIII: Defamation*

The Court first considers Plaintiffs' defamation claim against each of the CBI Defendants. "To prevail on a defamation claim under Arizona law, a plaintiff must show (1) the defendant published a false and defamatory statement, and (2) the defendant either (a) knew the statement to be false and defamatory, (b) acted in reckless disregard to these matters, or (c) acted negligently in failing to ascertain them." *Burton v. Ariz. Dep't of Pub. Safety*, No. CV-20-00920-PHX-JAT, 2025 WL 2806760, at *4 (D. Ariz. Oct. 2, 2025) (citing *Peagler v. Phx. Newspapers, Inc.*, 560 P.2d 1216, 1222 (Ariz. 1977)).

Plaintiffs allege that the CBI Defendants defamed Castillo by publicizing to, "among others, Blue Cross/Blue Shield, that Plaintiff Megan suffered from 'Unspecified schizophrenia spectrum and other psychotic disorder' and 'Unspecified anxiety disorder.'" (Doc. 213 at 32 ¶ 123.) Plaintiffs have clarified in their briefing that they do not assert this claim against Michael (Doc. 235 at 2) or Carrasco (Doc. 236 at 2). Accordingly, the Court will dismiss the defamation claim as to Michael and Carrasco with prejudice.

The SAC otherwise fails to allege a defamation claim. The SAC only provides "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678. The Court cannot discern the factual basis of Plaintiffs' purported defamation claim. To start, Plaintiffs assert that each CBI Defendants "falsely publicized to, among others, Blue Cross/Blue Shield" Castillo's diagnoses. (Doc.

213 at 32 ¶ 123.) The Court will not venture to guess who is included in "among others." That aside, it is unclear what role each CBI Defendant played in the alleged "publicization." Generally, only the person "who publishes a false and defamatory communication concerning a private person is subject to liability." *Dube v. Likins*, 167 P.3d 93, 104 (Ariz. Ct. App. 2007) (citation modified). The SAC is bereft of any facts establishing each Defendants role in the alleged publication.

Additionally, the SAC does not provide any details surrounding the alleged "publicization." This is significant because statements must be analyzed "within their proper context to determine their meaning." *Lucky's, LLC v. Berman*, No. 2 CA-CV 2024-0045, 2025 WL 2218597, at *9 (Ariz. Ct. App. Aug. 5, 2025); *see also BLK III, LLC v. Skelton*, 506 P.3d 812, 817 (Ariz. Ct. App. 2022), *as amended*, (Feb. 17, 2022) ("[T]he context and language of an allegedly defamatory statement is crucial to the court's analysis."). Arizona courts require claimants to "clearly and specifically allege the content and context of the challenged statements and why and how they were defamatory." *BLK III*, 506 P.3d at 817–18. Plaintiffs fail to do so here. Accordingly, the Court will dismiss the defamation claim as to the remaining Defendants without prejudice.

### 2. *Count IX: Battery*

Finally, the Court considers Plaintiffs' battery claim against CBI, Hogeboom and Andjelich. Under Arizona law, "[a]n actor is subject to liability to another for battery if the actor intentionally engages in an act that results in harmful or offensive contact with the person of another." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 438 (Ariz. 2003).

Castillo contends that during her commitment, she "was subjected to unconsented touching by CBI staff, including, but not limited to, the compelled ingestion of psychotropic medications, affixing of blood pressure cuffs to her arm, and extraction of blood and fluids." (Doc. 213 at 33 ¶ 128.) "These were ordered by Defendant Andjelich implementing the policies, practices and customs of Hogeboom and CBI."[9] (*Id.*)

---

[9] Strangely, the SAC also alleges that "[t]hese insults caused Plaintiff Megan physical pain and suffering, and were offensive to Plaintiff Megan and each constituted a separate

As noted, battery requires harmful or offensive contact.  *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1209 (9th Cir. 2016) (noting that, under Arizona law, battery requires offensive touching or contact).  Thus, the SAC's allegations plausibly allege that a battery was committed against Castillo in the form of nonconsensual touching.  However, the SAC does not identify the primary tortfeasor.  Instead, SAC alleges that Castillo "was subjected to unconsented touching by CBI staff."  (Doc. 213 at 33 ¶ 128.)  The SAC does not allege that either Hogeboom or Andjelich made direct contact with Castillo.  Instead, the SAC alleges that CBI staff engaged in the nonconsensual touching as "ordered by Defendant Andjelich implementing the policies, practices and customs of Hogeboom and CBI."  (*Id.*)  Thus, it appears that the SAC attempts to hold CBI, Hogeboom, and Andjelich under secondary theories of liability.  Insofar as the SAC attempts to do so, the Court must dismiss these claims because they are not developed either in the SAC or in the briefing.  The Court also notes that secondary theories of liability generally require "a valid, underlying tort claim."  *See Macy's Inc. v. H&M Constr. Co. Inc.*, No. CV-17-00990-PHX-DWL, 2019 WL 11718898, at *10 (D. Ariz. Aug. 16, 2019), *aff'd*, 843 F. App'x 841 (9th Cir. 2021) (noting vicarious liability claims required a valid underlying tort claim); *Federico v. Maric*, 226 P.3d 403, 405 (Ariz. Ct. App. 2010) (noting that aiding and abetting claims require proof that a primary tortfeasor committed a tort against the plaintiff).  Accordingly, the Court will dismiss the battery claim without prejudice.[10]

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED dismissing** Counts I, II, III, VI, VII with prejudice.  The Court also dismisses Count VII with prejudice as to Michael and Carrasco.

**IT IS FURTHER ORDERED dismissing** Counts IV, V, the remainder of Count

instance of battery."  (Doc. 213 at 33 ¶ 129.)  However, the SAC does not allege that anyone insulted Castillo.  Additionally, insults cannot give rise to a battery claim because battery requires offensive contact.  *Duncan*, 70 P.3d at 438.

[10]  The Court also notes that if the CBI Defendants are deemed state actors, this would seemingly implicate Arizona's notice of claim statutes.  *See Sanchez v. Maricopa County.*, 572 P.3d 101, 109 (Ariz. 2025).  However, this issue is not before this Court.

- 37 -

VII, and Count IX without prejudice.

**IT IS FURTHER ORDERED granting** Plaintiffs leave to amend only those claims dismissed without prejudice. If Plaintiffs so choose, they shall file a Third Amended Complaint no later than thirty (30) days after the date this Order is issued.

Dated this 29th day of April, 2026.

Honorable Susan M. Brnovich
United States District Judge